IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

YOUR TOWN YELLOW PAGES, L.L.C., §
                                 §
                    Plaintiff,   §
                                 § Civil Action No. 3:09-CV-0605-D
VS.                              §
                                 §
LIBERTY PRESS, L.L.C., et al.,   §
                                 §
                    Defendants.  §

MEMORANDUM OPINION
AND ORDER

Defendants Liberty Press, L.L.C. ("Liberty Press"), John Hogle ("Hogle"), Clyde Bawden ("Bawden"), and Phone Directories Company, L.P. ("PDC") move to dismiss this suit by plaintiff Your Town Yellow Pages, L.L.C. ("Your Town") pursuant to 28 U.S.C. § 1406(a) and Fed. R. Civ. P. 12(b)(2) and (b)(3) for lack of personal jurisdiction or improper venue. Alternatively, they move under 28 U.S.C. § 1404(a) to transfer the case to the District of Utah or Arizona.[1] For the reasons that follow, the court grants the motions of Hogle, Bawden, and PDC to dismiss for lack of personal jurisdiction. The court grants Liberty Press's alternative motion to transfer venue under 28 U.S.C. § 1404(a) and transfers Your Town's actions against Liberty Press and defendant Andrew Entrekin ("Entrekin")[2] to the District of Arizona.[3]

_____

[1]The parties filed two motions: one by PDC and the other by Liberty Press, Hogle, and Bawden.

[2]Entrekin did not file a motion to dismiss or transfer. The court is transferring the action against him based on Liberty Press's alternative § 1404(a) motion. *Cf. Fort Knox Music, Inc. v.*

This action arises from the printing and distribution of telephone directories in Tucson, Arizona. Defendant PDC, a Delaware limited partnership with its principal place of business in Utah, developed content for a Tucson telephone directory. For economic reasons, PDC decided not to print and distribute the directory. Around December 2008 plaintiff Your Town, a Texas corporation, became interested in acquiring the directory content and distributing the directories under its own name in Tucson. Your Town has its primary office in Carrollton, Texas and maintains a small office in Utah. Your Town's President, John Woodall ("Woodall"), resides in Texas, although he has a home and spends part of his week in Utah.

---

*Baptiste*, 139 F.Supp.2d 505, 512 (S.D.N.Y. 2001) ("Although a motion by one of the parties is ordinarily required for transfer, a district court may consider the possibility of transfer *sua sponte*, particularly when the parties have been given an opportunity to be heard prior to transfer.") (addressing § 1404(a) transfer) (citing *Lead Indus. Ass'n, Inc. v. Occupational Safety & Health Admin.*, 610 F.2d 70, 79 n.17 (2d Cir. 1979); *Nwanze v. Philip Morris Co.*, 1999 WL 292597, at *3 (S.D.N.Y. May 10, 1999)). This procedure is fair to Entrekin because he had knowledge from the court filings that defendants were seeking in the alternative to transfer the case to Arizona or Utah. And for the reasons explained below, it will be more convenient, and in the interest of justice, for this litigation to be conducted in Arizona rather than here.

[3]Although Liberty Press, Hogle, and Bawden state in their reply brief that they will file a motion to request discovery on the jurisdictional issues raised by their motion to dismiss, no motion has been filed. The court will proceed on the basis of the motions filed.

Your Town has had a four-year relationship with Liberty Press, a Utah-based printing company. During this period, it has placed various orders with Liberty Press for printing Your Town directories. At the beginning of the parties' relationship, C.W. Roberts ("Roberts"), the then-President of Your Town, signed a January 17, 2006 "Liberty Press Credit Application" ("Credit Agreement"). The Credit Agreement contained provisions regarding payment for printing orders, and it included a forum selection clause. In 2009 Liberty Press participated in negotiations concerning the sale of the Tucson content from PDC to Your Town, apparently to satisfy debts Your Town owed Liberty Press.

In January 2009 Woodall traveled to Tucson to meet with Mark Oldham ("Oldham"), the Chief Operations Officer of Liberty Press, to discuss the acquisition of the Tucson directory content. Robert Bishop II ("Bishop"), a Texas resident and personal friend of Woodall who was interested in investing in the Tucson directory, and two former employees of PDC were also present at the meeting. Later that month, Mike Bynum ("Bynum"), the President of PDC, and Oldham traveled to McKinney, Texas to meet with Bishop and Woodall to further discuss the Tucson directory. Negotiations also occurred through various telephone conversations and emails.

On February 4 and 5, 2009 Oldham, Woodall, and Bishop met again in Texas without Bynum, drafting a February 13, 2009 "Letter of Understanding" ("LOU"). The LOU outlined the basic terms of an

agreement between PDC and Your Town for the sale of the Tucson content. Bynum signed the LOU in Utah on behalf of PDC, and Woodall signed in Texas on behalf of Your Town. It was also agreed that Liberty Press would print the directories and that Bishop would pay for the cost of printing them, although these terms were not included in the LOU. Around this time, Bishop partially completed and signed a second credit agreement ("Bishop Credit Application"), virtually identical in terms to the first, that contained a forum selection clause.

PDC apparently delivered the content of the directories to Your Town in Texas, although this fact is somewhat disputed. During a period of two or three days in its Carrollton, Texas office, Your Town, with the aid of former PDC employees, prepared the content for printing. At some point, Your Town's trademarked logo was added to the cover and to each directory page.

The content was sent electronically to Liberty Press, and soon thereafter Liberty Press began printing the directories. Problems arose because Liberty Press understood that Bishop had agreed to make a down payment for printing the directories (an agreement Bishop and Woodall dispute), and none was received.

Sometime in March, with printing partially completed, Liberty Press became concerned about the payment for the directories and began meeting with other investors to buy and distribute the directories without Your Town's authorization. According to Your

Town's amended complaint ("complaint"), the other investors were defendants Entrekin, a citizen of Alabama, and Hogle and Bawden, both citizens of Arizona. Liberty Press sold the directories to Tucson Pages, a recently-formed Arizona company, of which Oldham is a member. Hogle applied to register the trade name "Tucson Pages" in Arizona. In addition, a corporation named Your Town Yellow Pages, L.L.C. was formed in Arizona with members Hogle, Bawden, Entrekin, and Oldham.

The directories were subsequently distributed in Tucson, still bearing Your Town's trademark and name. Soon after, Your Town received several inquiries relating to the Tucson directories, including a complaint at its Texas office regarding the use of allegedly copyrighted material in them. Your Town also alleges that harmful rumors began circulating about Your Town's financial condition. The proposed sale between PDC and Your Town was never completed, and Your Town and Bishop neither paid for the printing nor received any of the proceeds from the distribution of the Tucson directories.

Your Town sues some or all defendants for trademark infringement, unfair competition, trademark dilution, misappropriation, civil conspiracy, tortious interference with a contract or prospective contractual relationship (all defendants except PDC), indemnity, and breach of contract (Liberty Press and PDC).

A

Under 28 U.S.C. § 1406(a), defendants move for dismissal based on the forum selection clause found in the January 17, 2006 Credit Agreement signed by Roberts on behalf of Your Town. This forum selection clause states, in relevant part:

> Customer and the undersigned natural person hereby submit themselves and any disputes arising herefrom to the exclusive jurisdiction of the Courts of the State of Utah.

Ds. May 5, 2009 App. 9.[4] To the extent this clause is applicable to the instant suit, it requires dismissal without prejudice of the claims against a party to the agreement. *See Dixon v. TSE Int'l Inc.*, 330 F.3d 396, 398 (5th Cir. 2003) (holding "The Courts of Texas" did not include federal courts).[5]

"Because the forum selection clause is part of a contract, principles of contract interpretation apply." *IMCO Recycling, Inc. v. Warshauer*, 2001 WL 1041799, at *3 (N.D. Tex. Aug. 31, 2001) (Fitzwater, J.) (citing *McDermott Int'l, Inc. v. Lloyds*

---

[4]Because there are multiple motions, briefs, and appendixes, the court for clarity will refer to each by the date filed.

[5]Liberty Press also argues that the partially completed Bishop Credit Application signed by investor Bishop applies in this action. The Bishop Credit Application was signed during the negotiations between PDC and Your Town in 2009, and it contains a forum selection clause that is identical to the one in the 2006 Credit Agreement. But Bishop is not a party to this lawsuit, and there is no indication in the Bishop Credit Application that he was signing on behalf of Your Town. Thus the Bishop Credit Application cannot bind Your Town in this case.

*Underwriters of London*, 944 F.2d 1199, 1205 (5th Cir. 1991)). The
Credit Agreement is a contract between Your Town and Liberty Press
and therefore applies only as to Your Town's claims against Liberty
Press. The Credit Agreement mentions none of the other defendants,
and there is no evidence that other defendants were parties to the
agreement. Therefore, there is no apparent basis in the record to
apply the forum selection clause to Your Town's claims against
Hogle, Bawden, and PDC.

The court need not discuss at length the law of forum
selection clauses. The court need only decide whether the clause
is enforceable and whether this lawsuit falls within its scope.

B

"In determining whether the forum selection clause applies,
the court will assume not only that federal law governs the
determination of whether an enforceable forum selection clause
exists, but also that federal law controls whether [plaintiff's]
lawsuit falls within the scope of the forum selection clause."
*Ondova Ltd. Co. v. Manila Indus., Inc.*, 513 F.Supp.2d 762, 772
(N.D. Tex. 2007) (Fitzwater, J.) (citations, internal quotation
marks, and brackets omitted). Your Town argues that the forum
selection clause does not apply because Woodall, Your Town's
current President, was unaware of the Credit Agreement. This
argument lacks merit because Roberts was signing as a principal on
behalf of Your Town (listed as the "Customer" in the Credit

Agreement).  Your Town admits that Roberts was properly signing as a principal of Your Town at the time.  *See* P. May 26, 2009 Br. 2 (stating that the Credit Agreement was "signed by former principals of Your Town in January 2006.").  Roberts therefore bound Your Town to the terms of the Credit Agreement.

Further, the Credit Agreement does not state a termination date, and it clearly contemplates covering future orders that Your Town places with Liberty Press.  The Credit Agreement contains language indicating that the agreement applies as soon as Your Town places an order or transacts business with Liberty Press.  *See* Ds. May 5, 2009 App. 8-9 ("In consideration of Liberty Press . . . accepting an order from Customer or otherwise transacting business with Customer, Customer and the undersigned natural person agree to be bound by the following terms and conditions.").  The Credit Agreement also anticipates multiple orders of various quantities and prices.  *See id.* at 8 ("Will your purchases be exempt from sales tax?"); *see also id.* at 9 (listing different ranges of acceptable "overs" and "unders" that vary in accordance with quantity ordered).  Finally, the records of two orders (denominated "Estimate") that Woodall placed during 2008 indicate that each incorporated terms one through twelve of the Credit Agreement.  *See* Ds. June 10, 2009 Supp. App. 6 and 8 (stating, in pertinent part, that "The Customer and natural person signing below agree to be bound by terms one through twelve of the 'Liberty Press Credit

Application' with the understanding that the reference to 'Liberty Press' therein shall mean 'Liberty Press, L.L.C.'").

The Credit Agreement is a contract signed on behalf of Your Town, with no indication of a termination date. The language of the Credit Agreement and the subsequent Estimates demonstrate that the parties intended the Credit Agreement to cover future orders. The Credit Agreement was therefore still in effect and binding on Your Town during the period relevant to this litigation.

C

The court must next determine the scope of the forum selection clause. To do so, "the court must examine the language of the contract to determine which causes of action are governed by the forum selection clause." *Aerus LLC v. Pro Team, Inc.*, 2005 WL 1131093, at *7 (N.D. Tex. May 9, 2005) (Lynn, J.) (citing *Marinechance Shipping, Ltd. v. Sebastian*, 143 F.3d 216, 222 (5th Cir. 1998)). "If the substance of the plaintiff's claims, stripped of their labels, does not fall within the scope of the forum selection clause, the clause cannot apply." *Id.*

Your Town argues that the forum selection clause is inapplicable because the Credit Agreement is wholly unrelated to the current lawsuit. The forum selection clause covers "any disputes arising herefrom." As with any contract, the objective intent of the contracting parties controls. Courts have determined the parties' intent as to the scope of a forum selection clause by

- 9 -

comparing the contract language to other common forum selection clause language. *See, e.g.*, *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 226 (2d Cir. 2001) (stating that "arising under" is limited to "a literal interpretation or performance of the contract" and narrower than "arising from" in the context of arbitration clauses); *Wyeth & Bro. Ltd. v. Cigna Int'l Corp.*, 119 F.3d 1070, 1075 (3d Cir. 1997) (interpreting "arising in relation to" more broadly than "arising under," and noting that "related to" is "extremely broad"); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988) (holding "all disputes arising in connection with the present contract" to be broad in scope, encompassing "every dispute between the parties having a significant relationship to the contract regardless of the label attached to the dispute."); *TGI Friday's Inc. v. Great Nw. Rests., Inc.*, ___ F.Supp. 2d ___, 2009 WL 2576374, at *5 (N.D. Tex. Aug. 20, 2009) (Fitzwater, C.J.) (holding that "Forum selection clauses covering claims 'relating to' an agreement are broad in scope."); *Oceantrade S.A. v. Nuttery Farms, Inc.*, 2005 WL 3299716, at *2 (N.D. Cal., Dec. 6, 2005) (interpreting "settlement of all and any dispute arising herefrom" liberally).

The Oxford English Dictionary defines "herefrom" as "[f]rom this thing, fact, or circumstance; from this source." *Oxford English Dictionary* 163 (2d ed. 1989). The word is akin to

"hereunder" or "arising under" in the direct relationship it suggests between the contract and the subsequent claim. *See William Noble Rare Jewels ex rel. William Noble, Inc. v. Christie's Inc.*, 231 F.R.D. 488, 491 (N.D. Tex. 2005) (Fitzwater, J.) (describing "hereunder" as limited to "relations that have arisen as a result of the contract"); *Buell Door Co. v. Architectural Sys., Inc.*, 2002 WL 1968223, at *6 (N.D. Tex. Aug. 20, 2002) (Sanderson, J.) (holding "arising hereunder" had "a very narrow scope"). The Fifth Circuit has stated in the context of arbitration clauses that narrow clauses cover only "claims that literally 'arise under the contract,'" as opposed to broad clauses, which "embrace all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute." *Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998); *see also id.* at 1069 (contrasting the narrow "arise under" to the broad "relates to"). Because the court deems "herefrom" to be similar in kind to "hereunder," it accordingly reads "herefrom" to be narrow in scope, meaning that it is limited to claims that arise under the contract. The court holds that the forum selection clause, by specifying that it applies to "any dispute arising herefrom," governs only claims arising under the Credit Agreement itself.

The court must now decide whether the current dispute arises under the Credit Agreement in this narrow sense.  The court holds that it does not.

The Credit Agreement is entitled a "Credit Application," suggesting that the agreement is limited to procuring credit for printing orders.  In general, the Credit Agreement concerns the details of paying for printing orders.  Not only were the Tucson directories not printed on credit, but Bishop, not Your Town, agreed to be responsible for the cost of printing.  Your Town's claims arise from the use of its trademark and the proposed business agreement memorialized in the LOU between Your Town and PDC, which Liberty Press actively helped negotiate.  The claims against Liberty Press stem from these failed negotiations, not from a payment promised by Your Town under the Credit Agreement.

Because Bishop, not Your Town, agreed to pay for the printed directories, if any credit agreement controlled, it would be the partially completed Bishop Credit Application.  *See supra* note 5.  The Bishop Credit Application cannot bind Your Town, however, because Your Town is not a party to it.  While the trademark and other claims may arise out of the LOU and negotiations surrounding the Tucson directory, they do not fall under the forum selection clause of the Credit Agreement.  Therefore, the court concludes that the current dispute does not arise under the Credit Agreement,

and the forum selection clause does not apply.

III

Defendants also contend that the court lacks personal jurisdiction over them, and they move to dismiss under Rule 12(b)(2).

A

"When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the non-resident." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985) (citing *Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1165 (5th Cir. 1985)). The determination whether a federal district court has personal jurisdiction over a nonresident defendant is bipartite. The court first decides whether the long arm statute of the state in which it sits confers personal jurisdiction over the defendant. If it does, the court then resolves whether the exercise of jurisdiction is consistent with due process under United States Constitution. *See, e.g.*, *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 335 (5th Cir. 1999). Because the Texas long arm statute extends to the limits of due process, the court need only consider whether exercising jurisdiction over defendants would be consistent with the Due Process Clause of the Fourteenth Amendment. *See id.*; *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 214 (5th Cir. 2000).

> The Due Process Clause of the Fourteenth
> Amendment permits the exercise of personal
> jurisdiction over a nonresident defendant when
> (1) that defendant has purposefully availed
> himself of the benefits and protections of the
> forum state by establishing "minimum contacts"
> with the forum state; and (2) the exercise of
> jurisdiction over that defendant does not
> offend "traditional notions of fair play and
> substantial justice." To comport with due
> process, the defendant's conduct in connection
> with the forum state must be such that he
> "should reasonably anticipate being haled into
> court" in the forum state.

*Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999) (footnotes

omitted). To determine whether exercising jurisdiction would

satisfy traditional notions of fair play and substantial justice,

the court examines "(1) the defendant's burden; (2) the forum

state's interests; (3) the plaintiff's interest in convenient and

effective relief; (4) the judicial system's interest in efficient

resolution of controversies; and (5) the shared interest of the

several states in furthering fundamental substantive social

policies." *Berry v. Lee*, 428 F.Supp.2d 546, 557 (N.D. Tex. 2006)

(Fitzwater, J.) (citations omitted).

A defendant's contacts with the forum may support either

specific or general jurisdiction. *Mink*, 190 F.3d at 336 (citations

omitted). "General jurisdiction exists when a defendant's contacts

with the forum state are unrelated to the cause of action but are

'continuous and systematic.'" *Id.* In the case of specific

jurisdiction, "the defendant must have 'purposefully directed' his

activities at residents of the forum, and the litigation must

result from alleged injuries that 'arise out of or relate to' the defendant's activities directed at the forum." *Archer & White, Inc. v. Tishler*, 2003 WL 22456806, at *2 (N.D. Tex. Oct. 23, 2003) (Fitzwater, J.) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). Further, "the defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). The defendant must have personally availed himself of "the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). By requiring "purposeful availment," courts ensure that defendants are not haled into their jurisdiction "solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" *Burger King*, 471 U.S. at 475 (citations omitted).

When, as here, the court considers a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, it must accept as true all uncontroverted allegations in the complaint and resolve any factual conflicts in favor of the plaintiff. *Latshaw*, 167 F.3d at 211. "Therefore, in a no-hearing situation, a plaintiff satisfies his burden by presenting a *prima facie* case for personal jurisdiction." *Id.* "This liberal standard, however, does not require the court to credit conclusory

allegations, even if they remain uncontradicted." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 2000 WL 35615925, at *2 (N.D. Tex. Sept. 15, 2000) (Fitzwater, J.) (citing *Felch v. Transportes Lar-Mex SA DE CV*, 92 F.3d 320, 326 n.16 (5th Cir. 1996)), *aff'd*, 253 F.3d 865, 869 (5th Cir. 2001) (per curiam) (affirming, *inter alia*, this conclusion).

B

Defendants contend that they do not have sufficient "minimum contacts" with Texas to confer specific personal jurisdiction on this court. Because "the requirement of minimum contacts must be met as to *each* defendant," *Salem Radio Representatives, Inc. v. Can Tel Market Support Group*, 114 F.Supp.2d 553, 557 (N.D. Tex. 2000) (Sanders, J.) (emphasis in original), the court will address each defendant in turn.

1

First, the court will consider the investors: Hogle and Bawden. Your Town alleges that the investors bought the Tucson directories from Liberty Press and distributed them in Tucson. They also formed Arizona corporations to conduct these business transactions, including an Arizona corporation named Your Town Yellow Pages, L.L.C. Your Town asserts claims against the investors for tortious interference with contract, civil conspiracy, indemnity, trademark infringement, unfair competition, trademark dilution, and misappropriation.

The investors are not Texas citizens, nor is there any evidence that any investor visited Texas or conducted business in this state. Nevertheless, although a defendant may lack a physical connection to the forum state, tortious activity intentionally aimed at the state can establish a prima facie showing of personal jurisdiction.

> When a nonresident defendant commits a tort within the state, or an act outside the state that causes tortious injury within the state, that tortious conduct amounts to sufficient minimum contacts with the state by the defendant to constitutionally permit courts within that state, including federal courts, to exercise personal adjudicative jurisdiction over the tortfeasor and the causes of actions arising from its offenses or quasi-offenses . . . . Even an act done outside the state that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct.

*Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 628 (5th Cir. 1999). In *Calder v. Jones*, 465 U.S. 783 (1984), the Supreme Court concluded that there was personal jurisdiction based on the effects felt in California of intentionally libelous conduct in Florida, because the brunt of the harm from the libel was felt in California and aimed at California. *Id.* at 789; *see Guidry*, 188 F.3d at 629 (holding the *Calder* effects test extends beyond libel cases).

But "*Calder*'s 'effects' test 'is not a substitute for a nonresident's minimum contacts that demonstrate purposeful

availment of the benefits of the forum state.'" *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001) (per curiam) (quoting *Allred v. Moore & Peterson*, 117 F.3d 278, 286 (5th Cir. 1997)). The tortious activity in another state must be intentionally aimed at Texas, because a non-resident defendant cannot be subject to personal jurisdiction "simply because the plaintiff's complaint alleged injury in Texas to Texas residents, regardless of the defendant's contacts." *Id.* at 870. Moreover, "the foreseeability of causing injury in Texas [is] not a 'sufficient benchmark' for specific jurisdiction." *Id.* at 869 (quoting *Burger King*, 471 U.S. at 474). There must be "'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws,' or 'purposefully directs' its efforts toward the forum State residents." *Id.* (quoting *Burger King*, 471 U.S. at 475). In the context of defamation, the Fifth Circuit has distinguished *Calder* from general defamation over the Internet, pointing out that, in *Calder*, the defendant had its largest circulation in California and knew the effects of its defamation would be felt there, justifying personal jurisdiction. *See Revell v. Lidov*, 317 F.3d 467, 472 (5th Cir. 2002) (citing *Calder*, 465 U.S. at 789-90). In contrast, in *Revell* the alleged defamation posted on the Internet "was not directed at Texas readers as distinguished from readers in other states." *Id.* at

473.

In the present case, the directories were published only in Arizona and were not even available to Texas consumers.  Although the Your Town logo used on the directories was that of a Texas corporation, Your Town has not made a prima facie showing that Hogle and Bawden intentionally targeted their actions at Texas. The complaint does not even allege that the investors, as opposed to PDC and Liberty Press, knew that Your Town was a Texas corporation or had ever had contact with Your Town.  Your Town has therefore failed to make a prima facie showing of purposeful availment to warrant the exercise of personal jurisdiction.  To conclude otherwise would be to base jurisdiction solely on the fact that the injured plaintiff was a Texas resident, an insufficient ground to find the minimum contacts required for personal jurisdiction.  *See Panda Brandywine*, 253 F.3d at 870.[6]

Therefore, the court holds that Your Town's actions against Hogle and Bawden must be dismissed without prejudice for lack of personal jurisdiction.

2

The court considers, second, whether Your Town has made a prima facie showing that Liberty Press has sufficient minimum

---

[6]Neither party submits any facts to suggest that Hogle and Bawden maintain systematic contacts with Texas sufficient to support general personal jurisdiction.  The court therefore concludes that Your Town failed to make a prima facie showing that the court can exercise general personal jurisdiction over them.

contacts with Texas.  Liberty Press had a relationship with Your Town over several years, consisting of various printing orders and meetings between the principals of the two companies, with at least a half dozen meetings in Texas.  Regarding the Tucson project specifically, Oldham made two trips to Texas on behalf of Liberty Press to assist in negotiations and drafting the LOU.  Unlike the investors, Liberty Press knew that by selling the Tucson directories to the investors, Your Town, a Texas company with whom it had a long-standing relationship, would be harmed.

This court has held that negotiating and entering into various agreements over a course of years, including "repeated correspondence and personal visits" to Texas, are sufficient to establish minimum contacts sufficient for specific personal jurisdiction.  *See Metromedia Steakhouses Co. v. BMJ Foods P.R., Inc.*, 2008 WL 794533, at *5 (N.D. Tex. Mar. 26, 2008) (Fitzwater, C.J.).  Similarly, Liberty Press has maintained a four-year relationship with Your Town involving various business deals, trips, and extended communications.  According to Woodall, Liberty Press has printed over $4.2 million in orders for Your Town, covering 1.8 million directories for over 12 separate locations in Texas.  Additionally, Your Town has made a prima facie showing that Liberty Press's allegedly tortious actions in Arizona were targeted at Texas.  Liberty Press was printing directories for a Texas corporation, and when it became concerned that it would not be

paid, it sold them to the investors to be distributed in Tucson. Liberty Press was aware of Your Town's Texas citizenship, and it knew that the sale of the directories to the investors would harm Your Town. Your Town has made a prima facie showing that Liberty Press directly aided in the distribution of Your Town's trademarked goods and possibly interfered with a contract it had helped negotiate in Texas, providing sufficient minimum contacts. Its years of interaction with Your Town regarding printing telephone directories confirm that it could reasonably anticipate being haled into court in Texas, and that it purposefully availed itself of the protections of Texas law through its years of conducting business in Texas.

3

Third, the court must consider whether it has specific personal jurisdiction over PDC. PDC's executive, Bynum, traveled to Texas in January 2009 to discuss the Tucson directory content. At a subsequent meeting in Texas between Your Town and Liberty Press, Your Town drafted the LOU, which it sent to Bynum in Utah, where Bynum signed it. Apparently, Your Town then began preparing the directory content for printing in Texas. The LOU that Bynum signed, however, contemplates performance primarily in Tucson. For example, the LOU discusses entering a mutual non-compete agreement regarding the Arizona market and states that the parties agree to Your Town's assumption of PDC's Tucson office lease. Other than

the negotiations surrounding the LOU, there is no evidence that PDC had any further contact with Your Town or Texas. There is no evidence of an extended relationship between PDC and Your Town.

Under the Due Process Clause of the Fourteenth Amendment, "the mere contracting with a resident of the forum state is not in itself sufficient to establish minimum contacts such that the forum state may exercise personal jurisdiction over the defendant." *Brammer Eng'g, Inc. v. E. Wright Mountain L.P.*, 307 Fed. Appx. 845, 847-48 (5th Cir. 2009) (per curiam) (citing *Burger King*, 471 U.S. at 479). Further, in *Brammer* the Fifth Circuit found that activities incidental to forming a contract—such as communications and requests for documents, etcetera sent to the forum state because the forum state was the home of one of the parties to the contract—were insufficient to constitute purposeful availment and the minimum contacts required to support personal jurisdiction. *Id.* at 848. Instead, the Fifth Circuit looked to the anticipated performance of the contract, choice-of-law provisions, and other relevant factors to determine specific personal jurisdiction. *See id.; see also Burger King*, 471 U.S. at 479 ("It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum.").

Your Town's Texas citizenship and Bynum's one trip to Texas to discuss the Tucson directories are insufficient to constitute minimum contacts for personal jurisdiction purposes. Bynum was not even present in Texas when Your Town and Liberty Press drew up the LOU. Further, the LOU contemplated performance in Arizona, not Texas. *See Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1068 (5th Cir. 1992) ("In contract cases, this Court has consistently looked to the place of contractual performance to determine whether the making of a contract with a Texas resident is sufficiently purposeful to satisfy minimum contacts."); *Prod. Promotions, Inc. v. Cousteau*, 495 F.2d 483, 495 (5th Cir. 1974) ("performance, contemplated or accomplished, is the touchstone"), *abrogated on other grounds by Ins. Co. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982)). In addition, no long-term relationship between Your Town and PDC was planned. *See Command-Aire Corp. v. Ontario Mech. Sales & Serv., Inc.*, 963 F.2d 90, 95 (5th Cir. 1992) (considering long-term relationship a factor in determining whether contract produced minimum contacts). Your Town has failed to make a prima facie showing that PDC had minimum contacts with Texas based on the LOU. Therefore, the court lacks specific personal jurisdiction over PDC.

Nor can the court exercise general personal jurisdiction. The "'continuous and systematic contacts test [for general jurisdiction] is a difficult one to meet, requiring extensive

contacts between a defendant and a forum.'" *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008) (quoting *Submersible Sys. Inc. v. Perforadora Cent., S.A.*, 249 F.3d 413, 419 (5th Cir. 2001)) (other citations omitted)). Although PDC entered into a contract with another Texas company that has spawned pending litigation in Texas due to a contractual venue provision, this isolated relationship does not of itself qualify as "substantial activities" in Texas. *See Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 228 (Tex. 1991). Your Town has failed to make the required prima facie showing of the continuous and systematic contacts needed to support general jurisdiction. Accordingly, the court holds that it does not have personal jurisdiction over PDC.[6]

---

[6]Your Town also asserts that PDC is "a wholly owned subsidiary of HM Capital Partners LLC (or an affiliate thereof), a private equity group located in Dallas, Texas." P. June 30, 2009 Br. 7. But Your Town has failed to make a prima facie showing that PDC is the alter ego of HM Capital Partners LLC. The fiduciary shield doctrine, which ordinarily prevents exercising personal jurisdiction in such circumstances, "does not apply when courts are willing to disregard the corporate entity, usually on the theory that the individual or subsidiary is the alter ego of the corporation or parent." *Rolls-Royce Corp. v. HEROS, Inc.*, 576 F.Supp.2d 765, 787 (N.D. Tex. 2008) (Fitzwater, C.J.) (quoting *Stuart*, 772 F.2d at 1197). "[I]t is compatible with due process for a court to exercise personal jurisdiction over . . . a corporation that would not ordinarily be subject to personal jurisdiction in that court when the . . . corporation is the alter ego . . . of a corporation that would be subject to personal jurisdiction in that court." *Id.* (quoting *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 653 (5th Cir. 2002) (footnote omitted)).

"Under Texas law, '[a]lter ego applies when there is such unity between corporation and individual that the separateness of

C

Because the court has determined that Your Town has made a prima facie showing that Liberty Press had specific minimum jurisdictional contacts with Texas, the court must next examine whether exercising personal jurisdiction over Liberty Press would violate traditional notions of fair play and substantial justice. The court finds that it would not.

"[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477. Liberty Press has presented no such compelling reasons. The forum state, Texas, has an interest in protecting the trademark and reputation of a Texas corporation. Considering Your Town's choice of forum and Liberty Press's extended relationship with a Texas corporation, as well as travel to Texas, the court finds that exercising personal jurisdiction comports with due process. Thus the court holds it has specific

---

the corporation has ceased and holding only the corporation liable would result in injustice.'" *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 302 (5th Cir. 2007) (quoting *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986)). Alter ego "is shown from the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes." *Castleberry*, 721 S.W.2d at 272. Your Town has not made this showing.

personal jurisdiction over Liberty Press.

IV

Having concluded that the court has personal jurisdiction over Liberty Press, it turns next to Liberty Press's venue challenge under Rule 12(b)(3).

Once a defendant has objected to a plaintiff's chosen venue, the burden shifts to the plaintiff to establish that venue is proper. *See, e.g., Davis v. Billick*, 2002 WL 1398560, at *7 (N.D. Tex. June 26, 2002) (Fitzwater, J.). Because this action is based in part on federal question jurisdiction, 28 U.S.C. § 1391(b) controls the determination of venue.

Section 1391(b) provides that a civil action brought under this court's federal question jurisdiction may be brought only in:

> (1) a judicial district where any defendant resides, if all defendants reside in the same State,
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or,
> (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

Section 1391(c) provides that, "[f]or purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." The court's

conclusion that it has personal jurisdiction over Liberty Press controls the determination that venue is proper here under § 1391(b). Accordingly, the court denies Liberty Press's Rule 12(b)(3) motion to dismiss.

V

Liberty Press moves in the alternative to transfer this action to the District of Utah or Arizona pursuant to 28 U.S.C. § 1404(a).

A

Section 1404(a) provides that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." "The decision to transfer is made to prevent waste of time, energy, and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." *Bank One, N.A. v. Euro-Alamo Invs., Inc.,* 211 F.Supp.2d 808, 811 (N.D. Tex. 2002) (Fitzwater, J.) (citing *Stabler v. N.Y. Times Co.,* 569 F. Supp. 1131, 1137 (S.D. Tex. 1983)). The court cannot transfer a case where the result is merely to shift the inconvenience of the venue from one party to the other. *Fowler v. Broussard,* 2001 WL 184237, at *6 (N.D. Tex. Jan. 22, 2001) (Fitzwater, J.) (citing *Enserch Int'l Exploration, Inc. v. Attock Oil Co.,* 656 F. Supp. 1162, 1167 n.15 (N.D. Tex. 1987) (Fitzwater, J.)). Moreover,

> [t]he plaintiff's choice of venue is . . .
> entitled to deference, and therefore the party
> seeking transfer has the burden to show good
> cause for the transfer.  The burden on the
> movant is "significant," and for a transfer to
> be granted, the transferee venue must be
> "clearly more convenient than the venue chosen
> by the plaintiff."

*AT & T Intellectual Prop. I, L.P. v. Airbiquity Inc.*, 2009 WL
774350, at *1 (N.D. Tex. Mar. 24, 2009) (Lynn, J.) (footnotes
omitted) (quoting *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315
(5th Cir. 2008) (en banc) ("*Volkswagen II*")).

The court must decide as a preliminary question "whether the
judicial district to which transfer is sought would have been a
district in which the claim could have been filed."  *In re
Volkswagen AG,* 371 F.3d 201, 203 (5th Cir. 2004) (per curiam)
("*Volkswagen I*"); *Volkswagen II*, 545 F.3d at 312 ("The preliminary
question under § 1404(a) is whether a civil action 'might have been
brought' in the destination venue.").  Once the court resolves this
issue, the court must in deciding whether to transfer the case
evaluate "a number of private and public interest factors, none of
which are given dispositive weight." *Volkswagen I*, 371 F.3d at 203
(citing *Action Indus., Inc. v. U.S. Fid. & Guar. Co.,* 358 F.3d 337,
340 (5th Cir. 2004)).

> The private concerns include: (1) the relative
> ease of access to sources of proof; (2) the
> availability of compulsory process to secure
> the attendance of witnesses; (3) the cost of
> attendance for willing witnesses; and (4) all
> other practical problems that make trial of a
> case easy, expeditious and inexpensive. The

> public concerns include: (1) the
> administrative difficulties flowing from court
> congestion; (2) the local interest in having
> localized interests decided at home; (3) the
> familiarity of the forum with the law that
> will govern the case; and (4) the avoidance of
> unnecessary problems of conflict of laws [or]
> the application of foreign law.

*Id.* (citations and quotation marks omitted; bracketed material added). "Although [these] factors are appropriate for most transfer cases, they are not necessarily exhaustive or exclusive." *Volkswagen II*, 545 F.3d at 315. Liberty Press must establish "good cause" for transferring the case, meaning that, "in order to support its claim for a transfer, [it] must satisfy the statutory requirements and clearly demonstrate that a transfer is '[f]or the convenience of parties and witnesses, in the interest of justice.'" *Volkswagen II*, 545 F.3d at 315 (brackets in original) (quoting § 1404(a)).

B

Liberty Press must first establish that the judicial districts to which transfer is sought are districts in which Your Town's suit could have been filed.

> "[A] transfer is authorized by [28 U.S.C.
> § 1404(a)] only if the plaintiff had an
> 'unqualified right' to bring the action in the
> transferee forum at the time of the
> commencement of the action; i.e., venue must
> have been proper in the transferee district
> and the transferee court must have had power
> to command jurisdiction over all of the
> defendants."

*Ill. Union Ins. Co. v. Tri Core Inc.*, 191 F.Supp.2d 794, 797 (N.D.

Tex. 2002) (Lynn, J.) (quoting *Shutte v. Armco Steel Corp.*, 431
F.2d 22, 24 (3d Cir. 1970)) (brackets and quotation marks in
original); *see also Liaw Su Teng v. Skaarup Shipping Corp.*, 743
F.2d 1140, 1148 (5th Cir. 1984), *overruled on other grounds by In
re Air Crash Disaster Near New Orleans, La.*, 821 F.2d 1147 (5th
Cir. 1987). Thus to transfer this case to Arizona or Utah, the
court must find that the district in question has both personal
jurisdiction over the defendant potentially being transferred and
that the district is a proper venue for this action.

As explained *supra* at § IV, venue is governed by 28 U.S.C.
§ 1391(b), which provides that venue is proper in "a judicial
district where any defendant resides." Liberty Press is
headquartered in Utah. Furthermore, § 1391(b)(2) provides that
venue may be established where "a substantial part of the events or
omissions giving rise to the claim occurred, or a substantial part
of property that is the subject of the action is situated." This
requirement is satisfied as to the District of Arizona because the
directories at issue were distributed there, constituting a
substantial part of the events at issue.

In addition, Liberty Press does not dispute that Utah and
Arizona have personal jurisdiction over it, because it requests in
the alternative that the suit be transferred to one of these
districts. Utah can exercise personal jurisdiction over Liberty
Press because it is headquartered there. Arizona can also exercise

personal jurisdiction over Liberty Press. "Arizona will exert personal jurisdiction over a nonresident litigant to the maximum extent allowed by the federal constitution." *A. Uberti & C. v. Leonardo*, 892 P.2d 1354, 1358 (Ariz. 1995). The constitutional principles that control a state's exercise of personal jurisdiction are explained *supra* at § III(A). Relevant to the facts of this case, the Fifth Circuit has held that in a trademark infringement action, "placing a product into the stream of commerce, at least where the defendant knows the product will ultimately reach the forum state," is sufficient purposeful availment to supply specific personal jurisdiction. *Luv N'care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 470 (5th Cir. 2006). Liberty Press sold the allegedly infringing Tucson directories to Arizona residents with the knowledge that they would be distributed in Arizona. This intentionally-targeted act constitutes minimum contacts sufficient for specific personal jurisdiction in Arizona. Furthermore, Arizona's interest in the allegedly infringing directories distributed to its residents, together with Liberty Press's targeted actions, are sufficient for the exercise of personal jurisdiction over Liberty Press to comport with "traditional notions of fair play and substantial justice" under the Constitution.[7]

---

[7]Your Town has expressed a preference for litigating this case in Arizona if it cannot be litigated in Texas.

The court also concludes, essentially on the same grounds, that Your Town could have sued Entrekin in Arizona.[8] In addition to those grounds, Entrekin (together with Hogle, Bawden, and Oldham) formed Your Town Yellow Pages, L.L.C. in Arizona to conduct the business transactions——including the distribution of the directories——that are the subject of Your Town's lawsuit. An Arizona court could therefore exercise specific personal jurisdiction over Entrekin. And venue would be proper in Arizona under § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated" is found there.

C

The court now assesses the private and public interest factors. The first private interest factor concerns the ease of access to evidence. The evidence regarding the distributed directories is clearly located in Arizona.[9] The evidence of the contractual negotiations between the parties is likely situated at the headquarters of PDC, Liberty Press, and Your Town, i.e., in Utah and Texas. Additional evidence regarding the complaints Your

---

[8]Because the court holds that the case should be transferred to Arizona, it need not address whether Entrekin could have been sued in Utah.

[9]The parties have presented scant briefing on this private interest factor.

Town received after the publication of the directory would be in Texas and Arizona.  On the whole, this factor is neutral.

The second and third factors concern the availability of compulsory process over witnesses and the difficulty and cost of witnesses attending the court proceedings.  Noting that the only remaining parties in this action are Your Town, Liberty Press, and Entrekin, particular attention should be paid to non-party witnesses whom the parties may need to subpoena to compel attendance.  *See Volkswagen II*, 545 F.3d at 315-16.  The party-controlled witnesses are the principals and employees of Your Town and Liberty Press, residing in Utah and Texas, and Entrekin, who resides in Alabama.  The various non-party witnesses likely to be called include the following:[10] PDC employees living in Utah; Hogle and Bawden in Arizona; the two former PDC employees who helped negotiate the deal, who currently reside in Arizona; Roberts, the former president of Your Town, who lives in Texas; and Bishop, who also lives in Texas.  Your Town also suggests that a former office manager of Your Town and a bank lending officer, both of whom reside in Texas, are potential witnesses who are not under Your Town's control.  Thus the witnesses are divided among Texas, Arizona, and Utah.  The Texas witnesses are Your Town employees,

_____

[10]The court treats PDC employees and Hogle and Bawden as non-party witnesses because they are being dismissed from this lawsuit. In fact, it is reasonable to assume that Your Town will sue them in Arizona and that the new suit will be consolidated with this case after it is transferred to Arizona.

Roberts, Bishop, and the former office manager and bank lending officer. Arizona witnesses include the two former PDC employees, the investors residing in Arizona, and potential witnesses regarding the distribution of the directories in Arizona. Utah witnesses include Liberty Press and PDC employees. Entrekin resides in Alabama. In summary, there are party and non-party witnesses who reside in each of the potential fora. No state is clearly more convenient than another to the majority of the witnesses. Moreover, no state is geographically more convenient than another.

The fourth private interest factor is perhaps the most decisive in the instant case: the practical problems that make trial of a case easy, expeditious, and inexpensive. Because the court has dismissed all of the defendants except Liberty Press and Entrekin, it would presumably be easiest for the parties to litigate all of their claims at once in a venue that has personal jurisdiction over all of the parties to this dispute, particularly because the same factual issues will likely need to be resolved in the case of each defendant. Texas is not such a venue. Any decision on the merits of this case would clearly affect the outcome of any potential suits against the other defendants in other jurisdictions. Arizona, in particular, would be a superior venue to Texas; the parties could avoid costly piecemeal litigation because all of the defendants could be sued where the directories

were actually distributed and where the alleged harm occurred. Although Utah is the home of PDC and Liberty Press, it is unclear if courts in Utah would have personal jurisdiction over the investors. All of the parties participated in the planning, printing, or distribution of the directories distributed in Arizona, and therefore Arizona would be the most convenient place to pursue a unified case against all of the defendants on the merits. This factor provides good cause for transfer and indicates Arizona is "clearly more convenient than the venue chosen by plaintiff." *Volkswagen I*, 371 F.3d at 315.

D

The court now considers the public interest factors. First, the court evaluates differences in the administrative difficulties flowing from court congestion among the potential venues. Although, in 2008, the median time from filing to disposition was slightly shorter in this district for a civil case than it was in Arizona or Utah, the court finds this difference to be minor and therefore neutral.[11]

The second factor considers the local interest in the dispute. Because the directories were distributed in Arizona to that state's customers, Arizona certainly has a strong interest in this case.

---

[11]Your Town has presented evidence that, in 2008, the median time for a civil case from filing to disposition was 7.4 months in the Northern District of Texas, 9 months in the District of Arizona, and 8.5 months in the District of Utah.

The directories have only been seen by the public in Arizona, and Arizona residents potentially harmed by the directories' distribution have complained to Your Town. These residents clearly have an interest in the transparency of the source of their telephone directories and have an interest in any trademark-infringing products being circulated in their state. The residence of several investors in Arizona bolsters Arizona's interest in the outcome of this litigation. Texas and Utah also have an interest, but only as the outcome may have a direct financial impact on the parties residing in those states. The public at large is only affected in Arizona.

The third and fourth factors relate to the potential for transfer to generate a conflict of laws or a court having to apply unfamiliar laws of other states. This may pose a difficulty in Arizona or Utah if Texas state law applies to the state-law claims. According to Texas choice-of-law rules, however, "'the law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue.'" *De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1413 (5th Cir. 1995) (quoting *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984)). The first meeting negotiating the LOU was in Arizona in January 2009. In addition, Arizona is where the directories were distributed, where the trademark was allegedly infringed, and where the LOU was to be substantially performed. The only events that

took place in Texas were some of the negotiations of the LOU and possibly the insertion of the trademark in the directory content. Because the heart of this dispute——the distribution of the directories and the contemplated performance of the LOU——took place in Arizona, Texas law likely will not even apply to the state-law claims.[12]  As for the trademark claims, federal law will apply, avoiding any problems of interpreting unfamiliar law.

E

Considering all of the factors together, the court finds good cause to transfer Your Town's suit against Liberty Press and Entrekin to Arizona.  The District of Arizona is clearly more convenient when compared to this tribunal because of the convenience to Your Town of litigating all of its claims against the defendants at once.[13]  Arizona has a substantial interest in litigating this case, whereas this district's interest only arises because Your Town's corporate headquarters are located here.  A substantial portion of the non-party witnesses and the evidence of the distribution of the directories are available in Arizona. Finally, there are no great disadvantages to venue in Arizona,

---

[12]The court reaches this conclusion in the context of the present § 1404(a) motion.  The court does not suggest that this is a choice-of-law determination that is binding on the transferee court.

[13]The court has dismissed the actions against PDC, Hogle, and Bawden without prejudice.  They are therefore subject to being sued in Arizona, which would enable that suit and this transferred case to be consolidated and litigated together.  *See supra* note 10.

whereas Texas has the salient disadvantage of lacking personal jurisdiction over more than half the defendants. In its discretion, and for the convenience of the parties and witnesses and in the interest of justice, the court grants Liberty Press's motion to transfer the remaining actions to the District of Arizona.

\*    \*    \*

Accordingly, for the reasons explained, the court grants the May 5, 2009 motion to dismiss of Hogle and Bawden and the June 11, 2009 motion to dismiss of PDC, and dismisses Your Town's actions against them without prejudice. The court grants Liberty Press's May 5, 2009 alternative motion to transfer this case under 28 U.S.C. § 1404(a) and transfers Your Town's remaining actions against Liberty Press and Entrekin to the District of Arizona.

**SO ORDERED.**

November 2, 2009.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE